## WAGES SEQUESTERED TO DEFEAT ATTACHMENT.

Court of Appeals for Hamilton County.

L. KRUCKEMEYER CO. v. JOHN J. BURCKHAUSER.

Decided, May 28, 1915.

*Attachment and Garnishment—Wages of Employee Sequestered in Order to Defeat Attachment Proceedings.*

Where an action in attachment is brought against an employee and his employer is made garnishee, the employer is not at liberty to sequester wages thereafter earned by the employee up to the time of trial and the rendering of judgment; and where it is attempted by the device of paying the employee his wages in full each day in advance, judgment will be awarded to the creditor against the employer up to the amount which became due to the employee during the pendency of the action, if not in excess of the judgment recovered by the creditor.

*W. R. Collins*, for plaintiff in error.
*Jos. B. Derbes*, contra.

GRANT, J.; MEALS, J., and CARPENTER, J., concur.

This is a proceeding in which we are asked to reverse the judgment of the court of common pleas, for alleged errors there intervening.

The cause was begun in the court of a justice of the peace, from whose judgment an appeal was taken.

The petition for substance averred that the plaintiff recovered a judgment against one Jack Abrams.

In that action the defendant was served with a writ of garnishment, in due form, by which he was required to appear and made disclosure of the indebtedness, if any, existing from him to Abrams. He did not appear and did not answer, as he was commanded.

Thereafter the defendant was duly served with a warrant charging him as for a contempt, for his default in failing to answer under the process of garnishment referred to, and upon a hearing had in that behalf did not purge himself of the disobedience imputed to him.

Such further proceedings were then had that the magistrate's court, where the action was pending, found and adjudged that the defendant owed Abrams an amount of money, and ordered him to pay it, up to the sum of the judgment theretofore rendered against the latter in favor of the plaintiff.

The defendant made default in this respect also, and wholly neglected to pay the money into court, or to satisfy the plaintiff's judgment.

To recover the sum thus required to be paid, but which was not paid, was the prayer of the petition.

The defendant answered, admitting that Abrams was in his employment when the order of garnishment was served upon him, but denied that he then owed Abrams anything, or at any time thereafter.

Upon the issue as thus made up, the cause was put to trial before a jury. Testimony was brought forward on both sides, and at the conclusion of it all each party asked the court to direct a verdict in their favor, respectively.

The court did instruct the jury to return a verdict for the defendant, which was done.

An exception was saved, a motion for a new trial was made and denied, and final judgment was entered upon the verdict against the plaintiff for costs.

And this is the judgment complained of, and sought to be reversed here.

The evidence in the case is all before us on the record in a bill of exceptions, whereof the material part is of the following tenor and effect: The defendant admitted that he entirely and knowingly ignored the order of the magistrate requiring a disclosure from him as to whether he owed Jack Abrams anything or not. In fact his disobedience of that legal process was displayed by him rather ostentatiously than in contrition or apology. His theory of how he might safely help the plaintiff's debtor to beat the law and his creditor's rights under it, arose upon about the following state of facts:

Jack Abrams, he testified, was owing some two hnudred people when he passed into the employment of the defendant. If his earnings could be subjected to the payment of his debts, he had no appetite to go to work. This was about five years before the time of the trial below.

So the two executed this flank movement on the statutes of Ohio: Abrams was to operate one of the defendant's two saloons in the capacity of head "barkeep," although in one place in the record he is called a "cashier." Each morning the first thing he was to do—even before his devotions, for aught that appears—Abrams was to take out of the cash register of the concern the sum of $5.71, his agreed and liquidated wage for the day then and thus beginning. It was indeed said in the argument—though we can not find it in the record specifically —that the real compensation was $40 a week. But, as this, at the rate of matutinal withdrawal fixed by the bargain, with $5.71 as the dividend, would suggest an hebdomadal divisor of seven days instead of six, and therefore would beget the further suggestion that the saloon was to be kept running on the first day of the week, commonly called Sunday—a thing not to be thought of in this latitude—it must be a slander originating in the committee on arid lands.

At all events, such was the astute deal by which the law of Ohio was to be dispensed with, in the estimation of the parties to it. Some one expressed wonder to Sidney Smith as to how the villagers of his parish had so soon constructed a wooden

pavement. "Why," said the acute parson, "we simply put our heads together and the thing was done."

The invention possibly would merit letters patent for its novelty, were there not some doubts as to its usefulness.

For it is to be said that if the scheme should be permitted to have its way and operate to the effect intended, Burckhauser would be placed in the happy position of always employing Abrams but never owing him anything; that was the pellucid theory of the whole invention. The ancient Greeks were accustomed to figure interest by the month, and the month—as indeed its name indicates—was supposed to be dominated by the moon. So when Strepsiades got badly in debt through the horseracing propensities of his son, the advice for which he paid the manager of the phrontisterion, or thinking-shop at Athens, was to the effect that he should hire a Thessalian witch to capture the moon and put it in hiding. Then, presto! no moon, no months; no months, no interest. It was simplicity itself and may have been the key-word to the plan we are now discussing. And what came to the Greek debtor and the thinking-shop would be interesting matter if one should care to pursue it in the pages of the master satirist of antiquity. We can not pursue it, because it would too surely and too early anticipate the conclusion we have reached, without waiting for its orderly sequence of unfolding. Stated otherwise and in terms of simple arithmetic, the example would stand about thus— Nothing from nothing leaves nothing, and nothing to carry.

We agree with counsel that the parties to this agreement of forever getting service and never owing for it, must reckon with Section 10270, General Code of Ohio, before it can be allowed to have the effect claimed for it, and given to it—apparently—by the judgment we are called upon to review. That section reads as follows:

"When any part of the earnings of the debtor is not exempt under the law relating to exemptions from levy or execution, the garnishee process shall be in force from the time of its service on such garnishee until the trial of the cause to determine the claim, debt or demand of the creditor, and also bind

all such earnings at the time of service and which become due from that time until the trial of such cause."

If words are to go for .anything at all, if language means what it says and can not be permitted to be a mere juggle, if what appears to show forth the plain legislative intent is not to give way to a paltering that shall confound shadow and substance, if terms apparently level to the comprehension of lawyer and layman alike are for that reason not open to either enlargement or diminution by judicial construction, if, we say, these things are so, then we must conclude that from the time of the process of garnishment on Burckhauser, he was disabled to sequestrate from the law and withhold from its grasp any part of what Abrams earned in the time between that time and the day the cause against the latter was tried. And the device adopted by the employer and the debtor could not defeat the operation of the statute upon the fund in the intervening time earned. From the time of service the wages of Abrams thereafter accruing, were not unappropriated, or subject to disposition or diversion at the will of the employee and his employer with legal notice and service had. From the time of the trial they were at the disposition of the court. In this case the trial court in that action did dispose of so much of them as is in controversy here by directing payment to be made to the garnishing creditor. To this lawful disposition the defendant gave no heed whatever. He did not take the trouble even to answer to disclose his relations with Abrams. When haled to court to explain his disobedience he sets up what in effect is an agreement between two private men, not members of the Legislature, to repeal a statute of Ohio. This is stretching the doctrine of recall beyond its utmost tension; it is breaking it to pieces.

Upon which we are to observe, that it will take more than two men—no matter if one of them is, as has been urged in argument, indispensable in his line of industry—to make such a contract effectual in this case. It will take at least a majority of this court to work that result in the case at bar; and, as may have been gathered from what has already been said, a majority, or even unanimity is not wanting. It would in our estima-

tion be doing violence to the letter of the English language as crystallized in the statute quoted, and a burlesque on common justice and ordinary honesty, to give effect to such a manifest perversion of law and business morals as is claimed, in effect, by the defense in this cause.

Some decisions from which a different conclusion might, as is said, be reached were brought to our attention in the argument at the bar. We do not feel called upon to discuss the effect of these upon their proper cases, or in any case to which they could under law at the time existing properly be applied, more particularly than to say that under the statute with which we are dealing they appear to us to be totally inapplicable. They were rendered at a time when the controlling and coercive statute did not command the garnishee to withhold from his servant, pending a trial, wages earned between the commencement of the action and the time it is tried. The statute in force when this cause had its inception did so command. Perhaps, probably, it may be said, because of the decisions thus brought to our attention, the statute was made to take the form of so commanding, and courts are to administer the law as it is, and not as it was aforetime.

Another consideration that was commended to us on the argument at the bar was that the case in hand was one of an overpowering necessity. That the services of Abrams in his profession were so invaluable and so bound up in his own personality that on grounds approximating, it should almost seem, to a public necessity—in Cincinnati—any impeccable breaches of the laws made for the collection of his debts should be excused. And the contract to set aside the statute for his benefit—since he admitted he was not going to work if his creditors were going to get the usufruct in the shape of the garnishment plan of 10 per cent. for cash—was hit upon as a sort of emergency measure, so to speak.

We are sorry to think that the privilege of dodging what the new Constitution meant to give the people in the way of referendums is limited to the Legislature; it can not be delegated to saloon keepers. It will have to be denied here. The claim as

of right to dispense with statutes drove one English king from his throne and took the head of another from his shoulders. If it was refused to them, it can not be accorded to the proprietor of even two saloons two centuries and a quarter later. The judgment is not to be upheld on this claimed ground of public policy and necessity.

To reach another conclusion than this in this case, we should, to our own apprehension, stultify our office and come short of clearing the oath taken upon entering on its duties. And we can regard no man so powerful, or so indispensable to one's private concerns, as to shift from ourselves the obligations to be no respectors of persons in declaring the law and giving voice to its always impartial judgments. Were we to sustain the proceedings below we should not, as we conceive, be measuring up to the requirements of this inerrant and necessary standard.

The judgment complained of is without evidence to support it and is against the law of the case. The motion of the defendant for a directed verdict should have been denied and that of the plaintiff for a like verdict should have been allowed.

In these respects we find that manifest error has intervened, for which the judgment under review is reversed.

Each party at the trial asked the action of the court in directing a verdict. This was in law a submission of the cause to that court, and by consequence to this court. And, so finding, we proceed to render the judgment which we also find the court below should have entered, but did not enter, that the plaintiff recover according to the prayer of his petition in that court.